1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10

11   BARBARA HUBBARD,              )  Civil No. 09-1581-JLS(WVG)
                                   )
12                 Plaintiff,      )  ORDER AFTER ORDER TO
                                   )  SHOW CAUSE HEARINGS
13   v.                            )
                                   )
14   PLAZA BONITA, L.P., et al.,   )
                                   )
15                 Defendants.     )
                                   )
16   _____)

17

18                                 I

19                    PROCEDURAL BACKGROUND

20        On July 22, 2009, Plaintiff Barbara Hubbard (hereafter

21   "Plaintiff" or "Barbara"), filed a Complaint against the Plaza

22   Bonita Shopping Center, and most, if not all, of the tenants at the

23   shopping center.[1/] The Complaint alleges that all of the named

24   Defendants violated the Americans With Disabilities Act (hereafter

25   "ADA").

26        After the Complaint was filed, Plaintiff settled her action

27   with numerous named Defendants. On February 25, 2010, the Court

28   _____
     [1/]    Plaintiff's Complaint names at least 44 Defendants.

                                   1                        09cv1581

1   conducted a Settlement Disposition Conference with the remaining

2   Defendants.  Lynn J. Hubbard III (hereafter "Plaintiff's counsel"),

3   appeared in person at the conference on behalf of Plaintiff. David

4   Peters appeared in person at the conference on behalf of Defendant

5   Flava Enterprises (hereafter "Flava"). Jonathan Block appeared by

6   telephone at the conference on behalf of Hot Topic. Tony Bucchignani

7   appeared by telephone on behalf of Defendant Westfield America. At

8   that time, Defendants Hot Topic and Westfield America, *inter alia*,

9   had entered into settlement agreements with Plaintiff, but Defendant

10  Flava had not.  At the conference, Plaintiff's counsel informed the

11  Court that Plaintiff had passed away on November 13, 2009.[2]

12      After the conference, the Court directed Plaintiff's counsel

13  to file a Notice of Death pertaining to Plaintiff, pursuant to

14  Federal Rule of Civil Procedure 25. On March 17, 2010, Plaintiff's

15  counsel filed the Notice of Death of Plaintiff. The Notice states

16  that Plaintiff passed away on November 13, 2009.

17      On March 29, 2010, Plaintiff's counsel filed a Motion to

18  Substitute Barbara with Barbara's surviving husband, Lynn J.

19  Hubbard, II (hereafter "Lynn").[3]

20      On May 12, 2010, Plaintiff's counsel filed an Ex Parte Motion

21  to Dismiss this action as to the remaining Defendant Flava. On June

22  1, 2010, Defendant Flava filed an Opposition to the Motion to

23  Dismiss and requested that an Order To Show Cause (hereafter "OSC"),

24

25

---

26  [2]   Flava's counsel received a proposed settlement agreement from
      Plaintiff's counsel. However, Flava's counsel suspected that someone
27    other than Plaintiff may have signed the proposed settlement
      agreement because it was faxed to him on December 9, 2009, nearly a
      month after Barbara had died.
28

[3]   Plaintiff's counsel was the son of Barbara and Lynn.

09cv1581

1    hearing be held regarding the potential falsification of Barbara's

2    signature, after her death, on the settlement agreement with Flava.

3         On June 2, 2010, the District Judge assigned to this case

4    denied Plaintiff's counsel's Motion to Substitute Barbara with Lynn

5    because, by that time, Lynn had also passed away.[4/]

6         On June 23, 2010, Flava's Motion for an OSC was granted. The

7    Order Granting the Motion for an OSC directed Plaintiff's counsel to

8    address several topics raised by Flava's Motion. Thereafter,

9    Plaintiff's counsel and Flava filed briefs regarding the issues that

10   the Court directed to be addressed.

11        On June 28, 2010, the District Judge assigned to this case

12   referred the OSC to the undersigned.

13        On October 12, 2010, the Court held a hearing on the OSC.[5/]

14   Prior to the hearing, Plaintiff's counsel filed his own declaration,

15   supported by four of his other clients, that stated that the

16       standard operating procedure for (Plaintiff's coun-
       sel) and the Disabled Advocacy Group is for clients
17       to sign a document – it's called '(S)ignature
       (A)greement' and all it characterizes is basically a
18       special *power of attorney* that allows the Disabled
       Advocacy Group to execute any kind of settlement
19       agreement and/or endorse any settlement check or
       document in connection with the specific lawsuit in
20       question in which the client is being represented...
       (OSC Hearing Transcript, October 12, 2010 at
21       12)(emphasis added).[6/]

22   _____

23   [4/]    Plaintiff's counsel informed the Court that on March 31, 2010, Lynn
       passed away.

24   [5/]    The original OSC hearing was set for August 24, 2010. However,
       counsel requested extensions of time to file the requested briefing.
25       Therefore, the Court rescheduled the OSC hearing to October 12,
       2010.

26   [6/]    The "Signature Agreement" states: "I hereby agree that the Disabled
       Advocacy Group, APLC has my permission to execute any kind of
27       settlement agreement and/or endorse any settlement check or document

       (continued)
28       in connection with my Americans with Disabilities Act Lawsuit
       against [name of defendant(s)]." The Court refers to the "Signature

09cv1581

Pursuant to the Power of Attorney, the Court found that the signature on the Settlement Agreement provided to Mr. Peters on behalf of Flava, was not in fact, the signature of Barbara.(OSC Hearing Transcript, October 12, 2010 at 12).[1]

At the hearing, the Court requested that counsel file further briefing on several topics discussed at the hearing. Also, the Court continued the OSC hearing to January 27, 2011. Thereafter, counsel filed the requested further briefing.

On January 27, 2011, the Court held a continued OSC hearing. At the hearing, the Court ordered Plaintiff's counsel to file Supplemental Declarations regarding the authentication of Barbara's signature.  On February 10, 2011, the Supplemental Declarations were filed with the Court.

On March 24, 2011, the District Judge assigned to this case denied Plaintiff's Ex Parte Motion to Dismiss without prejudice, pending the issuance of this Order.

II

ISSUES RAISED AT THE OSC HEARING

---

Agreement as "Power of Attorney" or "POA."

The Power of Attorney signed by Barbara in connection with this action is attached to the Declaration of Lynn Hubbard III in Response to Order To Show Cause, filed August 3, 2010, Exh. D.  The Power of Attorney signed by Barbara in connection with another lawsuit, Hubbard v. Otay Ranch Town Center, is attached to the Declaration of Lynn Hubbard III in Response to Order To Show Cause, filed August 3, 2010, Exh. E. The Court notes that the signatures on Exhs. D and E appear to be different.

[1]   The Court notes that Plaintiff's counsel's Declaration directly contradicts his February 25, 2010 statement to the Court that "Barbara had signed numerous blank settlement agreements (prior to her death)."  The February 25, 2010 statement was made during a Settlement Disposition Conference that was not on the record and was not recited under oath.

1        The June 23, 2010 Order directed Plaintiff's counsel to

2   address the following topics:

3        1. Why he should not be required to present to the Court

4   documents and evidence that Plaintiff signed Exh. A,[8] attached to

5   Defendant's Supplemental Opposition to Plaintiff's Ex Parte Motion

6   to Dismiss and Request for Order To Show Cause (Doc. #182);

7        2. Why he should not be required to provide to the Court

8   additional known and genuine signatures of Plaintiff;

9        3. Why he should not be required to identify appearances that

10  Plaintiff personally made in this Court and any documents signed in

11  connection with those appearances;

12       4. Why a hearing should not be held as to whether the

13  signatures of Plaintiff in some or all of the settlement agreements

14  in this matter have been falsified, and if so, what actions are

15  appropriate to achieve accountability and deter those who would

16  engage in this conduct;

17       5. Why he should not be sanctioned for vexatious and

18  unreasonable multiplication of legal proceedings for:

19            (a) prolonging the litigation in this matter by

20  demanding settlements involving commitments to make changes to

21  settlement agreements after Plaintiff's death, including provisions

22  in settlement agreements awarding attorneys fees even if the changes

23  were not made;

24            (b) failing to timely disclose to the Court Plaintiff's

25  death;

26

27

---

28  [8]   Exh. A. is identified as containing a purportedly known genuine
          signature of Barbara.

09cv1581

1     6. Why his conduct should not be reported to the State Bar of

2  California;

3     7. Why he and his law firm (Law Offices of Lynn Hubbard III,

4  Disabled Advocacy Group, APLC) and the attorneys involved in this

5  matter should not be disqualified from further representation of

6  parties in litigation matters in this Court.

7     A. <u>Plaintiff's Counsel's Factual Response To The OSC</u>

8     On August 3, 2010, in response to the OSC, Plaintiff's

9  counsel described the circumstances under which Barbara signed the

10  settlement agreement with Flava Enterprises:

11     On November 11, 2009, Plaintiff's counsel met with Barbara,

12  who was hospitalized at the time, and told her that she was too

13  frail to continue prosecuting ADA cases.  Barbara agreed and told

14  him to settle her last case for whatever he could and give the

15  proceeds to his father (Barbara's husband, Lynn).

16     On November 12, 2009, Plaintiff's counsel instructed his

17  assistant, Kaina Schukei, to offer to settle with Defendant Hot

18  Topic. Hot Topic counter-offered and the counter offer was accepted.

19     On November 13, 2009, Barbara passed away. She did not have

20  a will. Lynn was Barbara's sole beneficiary under California law and

21  could decide what to do with her case. Lynn instructed Barbara's

22  counsel to "finish up" the pending lawsuit.

23     Over the next six weeks, Plaintiff's counsel finalized, or

24  attempted to finalize, settlements with the remaining Defendants in

25  the case. However, neither David Peters (hereafter "Peters"), nor

26  his client Flava, signed the Settlement Agreement and when pressed

27

28

09cv1581

1   to do so, cited Barbara's death[2/] and his client's unwillingness to

2   make changes to its facility because her lawsuit was moot.

3     On March 15, 2010, David Chamberlin (then employed by

4   Plaintiff's counsel) sent Peters a letter informing Peters that Lynn

5   intended to substitute himself as Plaintiff under Fed. R. Civ. Pro.

6   25(a)(1), and was willing to agree to the original settlement.

7   Peters did not respond.

8     On March 29, 2010, Lynn moved to substitute himself as

9   Plaintiff. However, on March 31, 2010, Lynn passed away.

10    Plaintiff's counsel and his staff immediately asked Peters to

11  stipulate to dismiss the lawsuit because there was no Plaintiff left

12  in the case and no other person to substitute for Plaintiff. Most

13  defense attorneys probably would have jumped at the opportunity to

14  get out of the litigation. However, Peters declined the invitation.

15    Five weeks later, Plaintiff's counsel requested dismissal of

16  this action because the action was moot.

17     B. <u>Flava's Response to Plaintiff's Counsel's Factual Response</u>
       <u>To The OSC</u>

18    Flava objected to Plaintiff's counsel's recitation of the

19  facts. He asserted that settlement offers which had been made to

20  Flava and Hot Topic had not been accepted prior to Barbara's death.

21  Instead, Flava and Hot Topic filed documents with the Court which

22  show that the offers for settlement were accepted after Barbara's

23  death.

24    The Certificate of Death filed by Plaintiff's counsel states

25  that Barbara passed away on November 13, 2009 at 12:55 PM. On

26  November 13, 2009 at 1:25 PM, Flava's counsel preliminarily accepted

27

28  [2/] Counsel for Flava learned of Barbara's death, not through any
    communication initiated by Plaintiff's counsel, but coincidentally
    from reading an article in The San Diego Reader newspaper.

09cv1581

1    Plaintiff's counsel's offer for settlement. After several changes

2    were made to the settlement agreement, on December 30, 2010, Peters

3    informed Plaintiff's counsel that Flava agreed to sign the settle-

4    ment agreement without any further changes. Plaintiff's counsel did

5    not respond to Peters.

6         C. Hot Topic's Position Regarding Settlement Of The Case

7         Hot Topic states, via the Declaration of Donna S. Gin, its

8    attorney:

> On November 12, 2009, I received a letter via facsim-
> ile from (Plaintiff's counsel's) office offering to
> settle the case against Hot Topic... *I verbally
> countered Plaintiff's offer... sometime on or after
> November 16, 2009. Our counter-offer was accepted
> verbally by (Plaintiff's counsel's) office on or
> around December 1, 2009.* On that day, I was told by
> Kaina Schukei, (Plaintiff's counsel's) senior
> paralegal that she would send over a draft settlement
> agreement the following day. *Until that point, we
> had not discussed any of the terms of the settlement
> agreement except for the dollar amount...*
> On December 7, 2009, Ms. Schukei responded (to me)
> via e-mail that our changes (to the settlement
> agreement) were acceptable to Plaintiff's counsel and
> that *she would get me signatures shortly.*
> When Ms. Schukei told me she would "get signatures,"
> I assumed she meant she would get the signatures of
> Plaintiff Barbara and her attorney Lynn Hubbard
> (III), as those were the only signature lines on the
> agreement besides Hot Topic's.
> On December 8, 2009, I received via facsimile a copy
> of the settlement agreement which had a signature in
> the blank for Barbara Hubbard. I believed the signa-
> ture on the document was indeed that of Barbara
> Hubbard because I had no reason to believe otherwise.
> I forwarded this document to my client for signa-
> ture...
> Hot Topic was dismissed from this action on or about
> January 11, 2010.
> Even with all of the foregoing communications, no one
> from (Plaintiff's counsel's) office ever informed me
> of the death of Plaintiff Barbara Hubbard, nor did I
> become aware of the same until long after Hot Topic
> was dismissed from the action. Had I known about
> (Barbara's) death at any time during the negotiation
> of the settlement, I would have immediately halted
> settlement discussions and notified my client of this
> development.

09cv1581

(Declaration of Donna S. Gin re: Plaintiff's Ex Parte Motion to Dismiss at 2-3)(emphasis added).

D. <u>October 12, 2010 OSC Hearing</u>

At the OSC hearing, the Court discussed with counsel the topics enumerated in Section II of this Order. The Court was satisfied with Plaintiff's counsel's explanations regarding several of the topics noted.[10] However, the authenticity of Barbara's signature on the Power of Attorney, and the survivability of the Power of Attorney after Barbara's death[11] continued to be issues that required further briefing. Therefore, the Court ordered counsel to address those issues in further briefing. A continued OSC hearing was held on January 27, 2011.

E. <u>January 27, 2011 OSC Hearing</u>

Prior to the January 27, 2011 hearing, counsel submitted further briefing required by the Court on October 12, 2010. At the hearing, counsel were given the opportunity to argue their respective positions regarding the authenticity of Barbara's signature and the survivability of the Power of Attorney after Barbara's death.

III

---

[10]   While the Court initially and tentatively was satisfied with Plaintiff's counsel's explanation, and was willing to give him "the benefit of the doubt," it became apparent after full and final reflection of the entire record and the case law presented, that Petitioner's counsel did not deserve, nor was he entitled to enjoy, the Court's continued willingness to give him the "benefit of the doubt."

[11]   In addition to the issues noted above, the following issues also remained unresolved: The imposition of sanctions on Plaintiff's counsel for his conduct in this litigation, whether the Court should report his conduct in this litigation to the State Bar of California, and whether Plaintiff's counsel and his law firm should be disqualified from further representation of parties in litigation matters in this Court.

09cv1581

## ANALYSIS

### A. Documented Contradictions

Prior to the February 25, 2010 conference, Plaintiff's counsel had not informed any defendant in this case, nor the Court, that Plaintiff had passed away over three months earlier on November 13, 2009. Additionally, Plaintiff's counsel informed the Court of the following:

- that he "heard (his) Mom was gravely ill," leaving the Court with the distinct impression "that Plaintiff's counsel did not personally observe his mother's condition, but was informed by someone else."(OSC Hearing Transcript, October 12, 2010, at 5);

- that Chris Kohler (another of Plaintiff's counsel's clients) or possibly Plaintiff's counsel's father, Lynn, may substitute in as Barbara's successor in interest, leading the Court to believe that no formal decision had yet been made. (OSC Hearing Transcript, October 12, 2010, at 8);

- that "Barbara Hubbard had signed numerous blank settlement agreements (prior to her death)," leading the Court to believe that the signature on the settlement demand and agreement provided to Mr. Peters on behalf of Flava was in fact "the genuine signature of Mrs. Hubbard, Barbara Hubbard." (OSC Hearing Transcript, October 12, 2010, at 12).

However, all of the representations were directly contradicted by Plaintiff's counsel's sworn declaration filed on August 3, 2010, in which he stated:

- He personally observed his mother's fragile condition at her hospital bedside at which time she instructed him to settle

09cv1581

1    the case quickly. (Plaintiff's counsel's Declaration at

2    paras. 3-10; OSC Hearing Transcript, October 12, 2010, at 5-

3    6);

4  • As early as November 17, 2009, but certainly no later than

5    December 8, 2009, Lynn had assumed "unofficial"[12] control of

6    this lawsuit upon Barbara's passing and that Lynn was

7    "ratifying" settlement agreements. (Plaintiff's counsel's

8    Declaration at paras. 17-21; OSC Hearing Transcript, October

9    12, 2010, at 6-10). Nowhere in the Declaration does Plain-

10   tiff's counsel even mention that Mr. Kohler was being

11   considered as Barbara's successor in interest.

12  • Barbara did not, in fact, sign numerous blank settlement

13   agreements, but rather executed a power of attorney giving

14   Plaintiff's counsel authority to sign a settlement agreement

15   on her behalf, which was standard and customary practice of

16   Plaintiff's counsel's law firm. (Plaintiff's counsel's

17   Declaration at paras. 34-36; OSC Hearing Transcript, October

18   12, 2010, at 11-12).

19              B. <u>Authenticity of Barbara's Signature</u>

20       At the January 27, 2011 hearing, the Court found that on the

21  record presented to it at that time, Plaintiff's counsel had failed

22  to properly authenticate Barbara's signature on the Power of

23  Attorney. (OSC Hearing Transcript, January 27, 2011, at 4-9).

24  Therefore, the Court ordered Plaintiff's counsel to file supplemen-

25  tal declarations of two of Barbara's family members to properly

26  authenticate Barbara's signature. On February 10, 2011, Plaintiff's

27

28  [12] "Unofficial" because no Motion for Substitution of Plaintiff had
       been filed.

09cv1581

1  counsel filed the Supplemental Declarations of Douglas Hubbard and

2  Elora Hubbard, which properly authenticated Barbara's signature.[13]

3              C. <u>Survivability of Power of Attorney</u>[14]

4      It is an elementary rule of law that the relation of attorney

5  and client is terminated by the death of the client..." <u>Mallory v.</u>

6  <u>Rittenhouse</u>, 99 Cal. App. 96, 104 (1929); <u>see also</u> <u>Lanza v. Bank of</u>

7  <u>America National Trust & Savings Assoc.</u>, 229 Cal. App. 2d 720, 724

8  (1964). "Generally, a power of attorney terminates on the death of

9  the principal. <u>People v. Fenderson</u>, 188 Cal. App. 4th 625, 634

10  (2010); <u>see also</u> California Probate Code § 4152(a)(4); Rest. 3d

11  Agency §3.06 and 3.07.

12      In <u>Mallory</u>, the court held that the attorney-client relation-

13  ship is terminated on the death of the client, "but an exception is

14  made in the case of a special contract of employment, such as a

15  specific contract to conduct a suit to final judgment, or some

16  agreement on a fee for the entire case." <u>Mallory</u> at 104. <u>Mallory</u> was

17  cited approvingly in <u>Lanza</u>, <u>supra</u>. In <u>Mallory</u>, the exception was

18  applied to a "contract to conduct a suit to final judgment," which

19  disposed of the whole case.

20      Plaintiff's counsel argues that Barbara's oral instructions

21  to him were that he was to immediately settle the case for whatever

22  he could get and give the funds to his father, Lynn. Therefore,

23  Barbara's oral instructions created a "specific contract to bring

24

25  [13]  Flava's objection to the Supplemental Declarations of Douglas

26  Hubbard and Elora Hubbard are overruled. Flava's request for an expert handwriting analysis of Barbara's signature is denied.

27  [14]  As previously noted, someone other than Barbara signed the

28  Settlement Agreement sent to Peters, pursuant to the Power of Attorney. As noted in footnote 7, Barbara did not sign numerous blank settlement agreements prior to her death, as Plaintiff's counsel originally stated to the Court.

09cv1581

1  (this) suit to final judgment," as quickly as possible. For this

2  reason, the attorney-client relationship did not terminate on

3  Barbara's death.

4      Flava argues that the <u>Mallory</u> exception does not apply

5  because the attorney-client relationship creates an agency relation-

6  ship, wherein the attorney acts as an agent for the client. To

7  support this position, Flava cites <u>Stoll v. Stoll</u>, 5 Cal. 3d 687,

8  692 (1936). The <u>Stoll</u> court held that contract liability may survive

9  the death of a contractor, but the contractor's agent's power to act

10 on behalf of the decedent contractor may not survive the decedent's

11 death. Flava's position is supported by <u>Webster Real Estate v.</u>

12 <u>Rickard</u>, 21 Cal. App 3d 612, 616-617 (1972). <u>Webster</u> dealt with a

13 real estate owner-broker contract in which the owner died before the

14 property was sold. The court held that death of the owner of the

15 property terminated the broker's agency and the authority of the

16 broker to represent the owner in seeking a buyer for the property.

17 The court cited the Restatement Second of Agency, which states: "One

18 cannot act on behalf of a non-existent person." Further, an agency

19 is terminated by the death of the principal. <u>Estate of Friedman</u>, 20

20 Cal. App. 3d 399 (1971); <u>Jay v. Dollarhide</u>, 3 Cal. App. 3d 1001

21 (1970) *superceded by statute on other grounds*; California Civil Code

22 §§ 2355(b) and 2356(a).

23     As a result, Flava concludes that in this case, the agency

24 was created and held for the benefit of Barbara, for her desire that

25 she be able to gain barrier-free access to the stores at Plaza

26 Bonita. The agency was not created for the benefit of Plaintiff's

27 counsel. As a result of Barbara's death, the agency terminated and

28 Plaintiff's counsel did not have the authority to act on Barbara's

09cv1581

1   behalf. Consequently, Plaintiff's counsel had no authority to sign

2   settlement agreements on Barbara's behalf after her death. The Court

3   agrees.

4          The <u>Mallory</u> exception may apply if the Court views Plain-

5   tiff's counsel's acts in settling Barbara's case, as bringing the

6   suit "to final judgment."   However, to bring a case to "final

7   judgment," is obviously different from bringing a case to settle-

8   ment, where a judgment is not entered. Nevertheless, a fair reading

9   of <u>Mallory</u> might suggest that bringing a case to "final judgment"

10  may be equivalent to ending the case by settlement. However, neither

11  Plaintiff's counsel nor Flava provided the Court with any authority,

12  nor could the Court find any authority, that defines whether

13  bringing a case to "final judgment" is the equivalent of ending a

14  case by settlement. Therefore, the Court does not adopt the view

15  that the two ways of ending a case, as noted above, are equivalent.

16         Regardless of whether "final judgment" and "settlement" are

17  functional equivalents or whether the attorney-client relationship

18  survived Barbara's death, the <u>Mallory</u> exception does not excuse or

19  justify Plaintiff's counsel's failure to inform opposing counsel

20  that Barbara had died, that the signature on the settlement

21  agreement was not hers, and that Plaintiff's counsel was relying on

22  <u>Mallory</u> for authority to sign the settlement agreement and bring the

23  case to conclusion. In other words, Plaintiff's counsel's conduct

24  lacked the transparency and candor expected of counsel practicing

25  before this Court.

26         D. <u>The Appropriateness of Signing Barbara's Name To The</u>
           <u>Settlement Agreement</u>

27         Even assuming the agency relationship extended beyond

28  Barbara's death, Flava argues that the <u>Mallory</u> exception does not

09cv1581

1   support Plaintiff's counsel's signing Barbara's name on an agreement

2   without informing Flava's counsel that the signature was not

3   Barbara's signature.

4       Flava goes further by accusing Plaintiff's counsel of forgery

5   of Barbara's name. It cites to U.S. v. Price, 655 F.2d 958, 960 (9th

6   Cir. 1981), which states that forgery is a:

> "false making, with intent to defraud, of a document
> which is not what it purports to be, as distinct from
> a document which is genuine but nevertheless contains
> a term or representation known to be false." "A
> document signed by a third person using the signature
> of another is a forgery..." "Forgery contemplates a
> writing which falsely purports to be the writing of
> another person than the actual maker..." "Signing
> one's own name with the intent that the writing be
> received as written by another person, *or impersonat-
> ing another in the signature of the instrument... or
> signing in such a way as to make the writing purport
> to be that of another... are all acts of forgery.*"
> (citations omitted)(emphasis added).

15       Therefore, Flava argues that Plaintiff's counsel's signing

16   Barbara's name on settlement agreements, without informing its

17   counsel that the signature on the document was not, in fact,

18   Barbara's signature, constitutes forgery.

19       Flava goes even farther by accusing Plaintiff's counsel of

20   committing fraud. Extrinsic fraud is the failure to disclose

21   material information. Estate of Anderson, 149 Cal. App. 3d 336

22   (1983). The fraud need not be completed to establish it. Intent to

23   defraud is required. People v. Russell, 214 Cal. App. 2d 445 (1963).

24   It is not necessary that no actual harm result from the fraud to

25   merit disciplinary action. Resnik v. Cal. State Bar, 1 Cal. 3d 198

26   (1969).

27       Flava alleges that it acted upon the signed settlement

28   documents as having Barbara's genuine signature on them. One of the

09cv1581

1  Defendants (Hot Topic), paid money to settle its action with

2  Barbara, in reliance that Barbara actually signed the settlement

3  agreement. Flava asserts that it incurred significant time and

4  expense in believing the same thing and acting pursuant thereto.

5      In _Hallinan v. State Bar of Cal._, 33 Cal. 2d 246 (1948),

6  defense counsel in that case explicitly requested that plaintiff

7  personally sign a release as part of the settlement of the case.

8  However, the plaintiff's attorney instead signed the release under

9  a power of attorney to do so, but did not inform opposing counsel

10 that the signature was that of the attorney, not the plaintiff. The

11 court held that an attorney who puts his client's signature on a

12 release, with the power of attorney to do so, without informing

13 opposing counsel that the signature is not the client's signature,

14 is deceptive and punishable conduct. The punishable conduct was not

15 that the attorney put his client's signature on the release, because

16 he had the authority to do so. Rather, the punishable conduct was

17 the failure to inform defense counsel that the signature on the

18 release was not his client's signature, but his own.[15]/ _Hallinan_ has

19 been followed for the same purpose and reasoning in _Aronin v. Cal._

20 _State Bar_, 52 Cal. 3d 276, 286-287 (1990).

21     The Court finds that the situation in _Hallinan_ is analogous

22 to the situation presented here. Plaintiff's attorney in _Hallinan_

23 had a power of attorney from his client to sign documents on the

24 client's behalf. The attorney signed the client's signature on a

25 release and did not inform defendant's counsel that the signature on

26 the release was not the client's signature, despite the defendant's

27

28  [15]/    In _Hallinan_, the attorney was punished with a three month suspension
         from the practice of law.

09cv1581

attorney's request that the client sign the release.[16/] The court held that the attorney's conduct in signing the release on behalf of his client, *without informing defense counsel that the signature on the release was not his client's signature*, was deceptive and punishable conduct. The Court noted that the attorney's signing of his client's name on the release was not the objectionable conduct. Rather, *not informing* defense counsel that the signature on the release was not the client's signature was objectionable.

The Court concludes that Plaintiff's counsel (or someone at his direction) placed Barbara's signature on the Settlement Agreements with Flava and Hot Topic under an expired power of attorney to do so, but *without informing* Flava's or Hot Topic's counsel that he had done so. Plaintiff's counsel's conduct in *not informing* Flava's and Hot Topic's counsel that the signatures on the settlement agreements were not, in fact, Barbara's signature, was

---

[16/]  The fact that defendant's counsel in <u>Hallinan</u> specifically requested that the client sign the release is one of the only distinguishing factors from the situation presented here. In this case, there was no specific request that Barbara personally sign the Settlement Agreement. Rather, Flava (and Hot Topic) tacitly understood that Barbara had personally signed the Settlement Agreements, by viewing what they believed to be Barbara's original signature on the Settlement Agreements, and by relying on communications with Plaintiff's counsel's firm which created and reinforced this false impression.

deceptive and punishable conduct. "This was an intentional deception

and thus constituted moral turpitude." <u>Aronin</u>, 52 Cal 3d at 287.[17]/[18]/

---

[17]/   The Court finds that Plaintiff's counsel *may have* violated the
following statutes and rules:
California Business & Professions Code §6106, which states:
The commission of any act involving moral turpitude, dishonesty or
corruption, whether the act is committed in the course of his
relations as an attorney or otherwise, and whether the act is a
felony or misdemeanor or not, constitutes a cause for disbarment or
suspension.

If the act constitutes a felony or misdemeanor, conviction thereof
in a criminal proceeding is not a condition precedent to disbarment
or suspension from practice therefor.

California Rule of Professional Conduct 3-110, which states in
pertinent part:
(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal or fail to
correct a false statement of material fact or law previously made to
the tribunal by the lawyer...

California Rule of Professional Conduct 5-220, which states:
A member shall not suppress any evidence that the member or the
member's client has a legal obligation to reveal or to produce.

American Bar Association Model Rule of Professional Conduct 3.3,
which states in pertinent part:
(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal or fail to
correct a false statement of material fact or law previously made to
the tribunal by the lawyer;...
(c) The duties stated in paragraphs (a)... continue to the
conclusion of the proceeding...

American Bar Association Model Rule of Professional Conduct 4.1,
which states in pertinent part:
In the course of representing a client a lawyer shall not knowingly:
(a) make a false statement of material fact or law to a third
person;...

American Bar Association Model Rule of Professional Conduct 7.1,
which states:
A lawyer shall not make a false or misleading communication about
the lawyer or the lawyer's services. A communication is false or
misleading if it contains a material misrepresentation of fact or
law, or omits a fact necessary to make the statement considered as
a whole not materially misleading.

American Bar Association Model Rule of Professional Conduct 8.4,
which states pertinent part:
It is professional misconduct for a lawyer to:
...
(c) engage in conduct involving dishonesty, fraud, deceit or
misrepresentation;

(continued)
(d) engage in conduct that is prejudicial to the administration of
justice;...

Southern District of California Local Rule 83.4 which states in

09cv1581

IV

SANCTIONS

There are two sources of authority under which a court can sanction a party for improper conduct: (1) 28 U.S.C. § 1927 and (2) the inherent power of federal courts to levy sanctions in response to abusive litigation practices. <u>Lahiri v. Universal Music and Video Distribution Corp.</u>, 606 F.3d 1216, 1219 (9th Cir. 2010); <u>B.K.B. v. Maui Police Dept.</u>, 276 F.3d 1091, 1107-1108 (9th Cir. 2002).

1. <u>28 U.S.C. § 1927</u>

28 U.S.C.A. § 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Imposition of sanctions under 28 U.S.C. § 1927 (hereafter "§ 1927") requires a finding of recklessness or bad faith on the part of the attorney sanctioned. <u>B.K.B.</u>, 276 F.3d at 1107; <u>Lahiri</u>, 606 F.3d at 1219.

---

pertinent part:
. . .
b. Standards of Professional Conduct. Every member of the bar of this court and any attorney permitted to practice in this court must be familiar with and comply with the standards of professional conduct required of members of the State Bar of California, and decisions of any court applicable professional conduct which are now adopted as standards of professional conduct of this court. This specification will not be interpreted to be exhaustive of the standards of professional conduct. In that connection, the Code of Professional Responsibility of the American Bar Association should be noted. No attorney permitted to practice before this court will engage in any conduct which degrades or impugns the integrity of the court or in any manner interferes with the administration of justice within the Court.

[18]/   The Court declines to address whether Plaintiff's counsel committed perjury or fraud, because these issues were not fully briefed by counsel. The Court leaves to others whether to investigate Plaintiff's allegations in these regards.

09cv1581

The plain language of § 1927 establishes that, when a court issues a sanctions award, it may include the costs, expenses and attorney's fees that were incurred by the aggrieved party by the sanctionable conduct. Sanctions imposed under § 1927 "must bear a financial nexus to the excess proceedings and may not exceed the "costs, expenses and attorney's fees reasonably incurred because of the sanctionable conduct." Norelus v. Denny's Inc., 628 F.3d 1270, 1297 (11th Cir. 2010).  Several courts have held that a sanctions award under § 1927 may include the costs arising from the sanctions proceedings themselves. See In re Tutu Wells Contamination Litigation, 120 F. 3d 368, 387-388 n. 21 (3rd Cir. 1997) *overruled on other grounds by* Comuso v. Nat. R.R. Passenger Corp., 267 F.3d 331, 331 (3rd Cir. 2001); Brandt v. Schal Assoc., Inc., 960 F.2d 640, 649-651 (7th Cir. 1992); In re Stauffer Seeds, Inc., 817 F. 2d 47, 50 (8th Cir. 1987).

Further, exclusion from a sanctions award the costs incurred in obtaining the award undermines the purposes of providing for sanctions. "The time, effort and money a party must spend to get another party sanctioned... is part of (the) harm caused by the other party's wrongful conduct." Norelus, 628 F.3d at 1298. Moreover, exclusion from a sanctions award undermines the goal of deterring future similar sanctionable conduct because it would discourage the aggrieved party from pursuing sanctions. Id., at 1298-1299.

### 2. Court's Inherent Powers

Under its "inherent powers," a district court may award sanctions in the form of attorneys' fees against a party or counsel who acts "in bad faith, vexatiously, wantonly, or for oppressive

09cv1581

reasons." <u>Primus Auto. Fin. Servs., Inc. v. Batarse</u>, 115 F.3d 644, 648 (9th Cir. 1997); <u>Adams v. AllianceOne, Inc.</u>, 2011 WL 2066617 at *5 (S.D. Cal. 2011). "This inherent power derives from the lawyer's role as an officer of the court which granted admission." <u>In re Snyder</u>, 472 U.S. 634, 643 (1985). Under this inherent power, and unlike statutory sanctions provisions, the Court may sanction a "broad range of improper litigation tactics." <u>Knupfer v. Lindblade (In re Dyer)</u>, 322 F.3d 1178, 1196 (9th Cir. 2003); <u>Adams, supra</u>, at *5.

Before awarding such sanctions, the Court must make an express finding that the sanctioned party's behavior "constituted or was tantamount to bad faith." <u>Roadway Express v. Piper,</u> 447 U.S. 752, 767 (1980), *superceded by statute on other grounds as recognized in* 749 F.2d 217, 222 n.4 (5th Cir. 1984)); <u>Lahiri,</u> 606 F.3d at 1219; <u>B.K.B.</u>, 276 F.3d at 1108. "[A] finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorney's fees.'" <u>Id.</u>, at 1108 [quoting <u>Fink v. Gomez,</u> 239 F.3d 989, 992 (9th Cir. 2001)]. "(S)anctions are available if the court specifically finds bad faith conduct or conduct tantamount to bad faith. Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as improper purpose." <u>Id.</u>, at 1108 (quoting <u>Fink</u>, 239 F.3d at 994). Bad faith can consist of "delaying or disrupting the litigation." <u>M.M. v. Lafayette School Dist.</u>, 2011 WL 830261 (N.D. Cal. 2011) [quoting <u>Hutto v. Finney</u>, 437 U.S. 678, 689 n.14 (1978).

09cv1581

1    The focus of the bad faith inquiry is the sanctioned party's
2    abuse of the judicial process. Roadway Express, 447 U.S. at 765-66.
3    The bad faith requirement ensures that the district court's exercise
4    of its broad power is properly restrained, and "preserves a balance
5    between protecting the court's integrity and encouraging meritorious
6    arguments." Id.; Adams, supra at *5.

7    Moreover, "the amount of an inherent powers sanction is meant
8    to do something very different than provide a substantive remedy to
9    an aggrieved party. An inherent powers sanction is meant to
10   'vindicate judicial authority.'" Mark Indus. v. Sea Captain's
11   Choice, 50 F.3d 730, 733 (9th Cir. 1995) (quoting Chambers v. NASCO,
12   Inc., 501 U.S. 32, 55 (1991). Nonetheless, the amount of monetary
13   sanctions based on attorneys' fees must be "reasonable." Brown v.
14   Baden (In re Yagman), 796 F.2d 1165, 1184-85 (9th Cir. 1986) amended
15   on other grounds by 803 F.2d 1085 (9th Cir. 1986); Adams, supra, at
16   *6.

17   Here, the Court finds that Plaintiff's counsel's conduct in
18   this litigation, as discussed in this Order, warrants the imposition
19   of sanctions under §1927 and its inherent authority. Specifically,
20   Plaintiff's counsel submitted to counsel for Flava and Hot Topic a
21   proposed settlement agreement that was represented to contain
22   Barbara's genuine signature, when the signature was not, in fact,
23   Barbara's signature. In presenting the settlement agreement to
24   counsel for Flava and Hot Topic, Plaintiff's counsel failed to
25   inform counsel for Flava, Hot Topic and the Court that the signature
26   on the settlement agreement was not that of Barbara, but instead,
27   penned by someone else.

28

09cv1581

1     The Court notes that Plaintiff's counsel first represented to
2  it at the February 25, 2010 Settlement Disposition Conference that
3  Barbara had signed numerous blank settlement agreements prior to her
4  death. This representation could have been made for only one
5  purpose: Plaintiff's counsel wanted the Court to believe that
6  Barbara had signed the proposed settlement agreement prior to her
7  death. However, when Flava's counsel informed the Court that the
8  proposed settlement agreement he had received from Plaintiff's
9  counsel was dated after Barbara's death, Plaintiff's counsel was
10 apparently forced to provide another explanation. It stretches
11 credulity to believe that Plaintiff's counsel simply and honestly
12 made several mistakes of fact on February 25, 2010. The circumstan-
13 tial evidence points to a different conclusion. However, the
14 resolution of the propriety of sanctions does not turn on a
15 resolution of the *mens rea* behind the February 25, 2010 misrepresen-
16 tations. Whether Plaintiff's counsel was intentionally deceptive or
17 honestly mistaken on February 25, 2010, one thing is undisputable:
18 Plaintiff's counsel informed no one that Barbara had died while he
19 continued to try to settle this action against Flava and Hot Topic
20 while at the same time leading opposing counsel to believe Barbara
21 was still alive and that she signed the settlement agreement.
22 Plaintiff's counsel's failure to inform all counsel concerned that
23 the signature on the proposed settlement agreements was not, in
24 fact, Barbara's signature, would have never come to light absent
25 Flava's counsel's presentation to the Court of Plaintiff's counsel's
26 conduct.

27     After Flava's counsel discovered that the signature on the
28 proposed settlement agreement that he received from Plaintiff's

09cv1581

1   counsel did not bear Barbara's genuine signature, he brought this

2   fact to the attention of the Court. Since the Court was presented

3   with Plaintiff's counsel's potentially objectionable conduct at that

4   time, the Court was required to have Plaintiff's counsel explain his

5   conduct with respect to Barbara's signature appearing on documents

6   dated after her death.

7        The Court finds that Plaintiff's counsel's conduct in this

8   regard, and the settlement agreements he submitted to Flava's and

9   Hot Topic's counsel and the Court, constitute recklessness and were

10  done in bad faith.  Had Plaintiff's counsel been candid with counsel

11  and the Court, the briefing requested by the Court by both Plain-

12  tiff's counsel and Flava's counsel, and the hearings held by the

13  Court, would not have been necessary. As a result, the Court

14  concludes that Plaintiff's counsel unreasonably and vexatiously

15  multiplied the proceedings in this case.

16       Further, the Court concludes that Plaintiff's counsel's

17  conduct, as discussed in this Order, was done for the purpose of

18  leading opposing counsel to believe that the proposed settlement

19  agreements received by them contained Barbara's genuine signature,

20  when in fact, they did not.  Plaintiff's counsel's conduct disrupted

21  the proceedings in this litigation and has delayed its conclusion.

22       Therefore, the Court concludes that any sanctions to be

23  imposed on Plaintiff's counsel will suffice to deter Plaintiff's

24  counsel from repeating the conduct as discussed in this Order.

25       As a result, on or before June 27, 2011, Flava's counsel

26  shall submit to the Court, for *in camera* review, his billing

27  statements for all work and expenses incurred that directly resulted

28  from Plaintiff's counsel's submitting to him a proposed settlement

09cv1581

1  agreement in this case which purported to bear Barbara's genuine

2  signature, but was not, in fact, Barbara's genuine signature. After

3  the Court reviews Flava's counsel's billing statements *in camera*, it

4  will issue appropriate monetary sanctions against Plaintiff's

5  counsel.

6            D. <u>Report of Conduct to the State Bar of California</u>

7        Since Plaintiff's counsel's conduct, as discussed in this

8  order, *may have* violated statutes and Rules of Professional Conduct,

9  (see fn. 17), the Court will report Plaintiff's counsel's conduct to

10  the State Bar of California.

11            E. <u>Disqualification From Further Representation In This Court</u>

12        In footnote 17 of this Order, the Court noted that Plain-

13  tiff's counsel's conduct in this litigation *may have* violated

14  statutes and Rules of Professional Conduct. At this time, the Court

15  declines to determine whether Plaintiff's counsel should be

16  disqualified from further representation in this Court. However,

17  pursuant to Local Rule 83.5, the Court refers Plaintiff's counsel to

18  the Standing Committee on Discipline.

19

20  DATED:  June 13, 2011

21

22                                _____

23                               Hon. William V. Gallo
                             U.S. Magistrate Judge

24

25

26

27

28

09cv1581